IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| IOWA PROTECTION AND ADVOCACY SERVICES, INC., | ) ) ) | NO. 4:02-CV-90004 |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| JESSIE K. RASMUSSEN, DIRECTOR IOWA DEPARTMENT OF HUMAN SERVICES, MICHAEL J. DAVIS, SUPERINTENDENT OF WOODWARD RESOURCE CENTER, KEVIN TECHAU, DIRECTOR IOWA DEPARTMENT OF INSPECTIONS AND APPEALS, MARVIN TOOMAN, ADMINISTRATOR, IOWA DEPARTMENT OF INSPECTIONS AND APPEALS, | ) ) ) ) ) ) ) ) ) ) ) | **PLAINTIFF'S MEMORANDUM IN SUPPORT OF REQUEST FOR INJUNCTIVE AND OTHER DECLARATORY RELIEF** |
| Defendants. | ) | |

## TABLE OF CONTENTS

| | | PAGE |
|---|---|---|
| FACTUAL BACKGROUND | | 3 |
| I. | STATUTORY AUTHORITY PROVIDING IOWA P & A ACCESS TO RECORDS OF PERSONS WITH DEVELOPMENTAL AND MENTAL HEALTH DISABILITIES PERTAINING TO INVESTIGATIONS OF ABUSE AND NEGLECT | 6 |
| II. | DEFENDANTS HAVE VIOLATED 42 U.S.C. SECTION 1983 BY THEIR REFUSALS TO PROVIDE IOWA P & A ACCESS WITH NECESSARY INVESTIGATIVE MATERIALS | 9 |
| III. | DEFENDANTS TECHAU AND TOOMAN HAVE VIOLATED THE PADD AND PAIMI ACTS BY REFUSING TO PRODUCE THE FULL DIA REPORT REGARDING TIELEBEIN'S DEATH | 10 |

Pleading # 17.

#818219

IV.   DEFENDANTS RASMUSSEN AND DAVIS HAVE VIOLATED THE
      PADD AND PAIMI ACTS BY REFUSING TO PRODUCE THE
      RANDALL HINES REPORT AND THE MINUTES OF STAFF
      DISCUSSION ------------------------------------------------------------------------   14

      A.   The Hines Report is Not Entitled to Attorney Work Product
           Protection ----------------------------------------------------------------   14

           1.   Defendants have not Proven the Hines Report was Prepared
                in Anticipation of Litigation ................................................16

           2.   Even if the Court Determines that the Hines Report is
                Attorney Work Product, Defendants have Waived any
                Protection Afforded to the Report........................................18

           3.   Iowa P & A has a Substantial Need for the Hines Report ..................18

      B.   The Minutes of the Staff Discussions are not Privileged and
           Confidential----------------------------------------------------------------   19

V.    THE COURT SHOULD ISSUE INJUNCTIVE RELIEF BECAUSE IOWA
      P & A HAS PROVEN THE MERITS OF ITS CLAIMS, THE HARM TO
      IOWA P & A OUTWEIGHS THE HARM TO DEFENDANTS, AND
      PRODUCTION OF THE MATERIALS TO IOWA P & A IS IN ACCORD
      WITH THE PUBLIC INTEREST---------------------------------------------------   21

CONCLUSION -----------------------------------------------------------------------------   22

## STATEMENT OF FACTS

Iowa Protection and Advocacy Services, Inc. (hereinafter "Iowa P & A") is a private, non-profit Iowa corporation which provides protection and advocacy services to persons with mental retardation and mental illness pursuant to the Developmental Disabilities Assistance and Bill of Rights Act of 2000 (hereinafter "PADD Act"), 42 U.S.C. section 15001, *et seq.*, and the Protection and Advocacy for Individuals with Mental Illness Act (hereinafter "PAIMI Act"), 42 U.S.C. section 10801, *et seq*.

On March 18, 2001, Larry Tielebein, a resident of 109 Franklin at Woodward Resource Center (hereinafter "Woodward"), died of suffocation while being restrained by Woodward employees.[1] The medical examiner conducted an autopsy of Mr. Tielebein, and later classified death as a homicide.

On March 20, 2001, a member from the media contacted Iowa P & A and reported there had been a death at Woodward. Iowa P & A responded by contacting Dr. Michael Davis, the Superintendent for Woodward, for information regarding the reported death. Dr. Davis stated Mr. Tielebein died while he was restrained. Dr. Davis also indicated he had obtained statements from employees and would be interviewing staff regarding Mr. Tielebein's death.

On the same date, Iowa P & A contacted the DIA to report the death and to inquire whether they were conducting an investigation. On March 21, 2001, Rhonda Bennett from the DIA called and stated that someone from the DIA would be sent out to investigate Mr. Tielebein's death.

---

[1] Mr. Tielebein is a person with developmental and mental illness disabilities within the meaning of the PADD Act, 42 U.S.C. section 15001, *et seq.*, and the PAIMI Act, 42 U.S.C. section 10801, *et seq*.

On March 22, 2001, staff from Iowa P & A went to Woodward to investigate Mr. Tielebein's death. Upon arriving at Woodward, the Iowa P & A staff presented Dr. Davis with a letter outlining Iowa P & A's federal authority to investigate Mr. Tielebein's death, and which requested the following information:

> any and all records of Larry Tielebein and all other individuals placed within your facility including but not limited to treatment plans, nursing and other staff progress notes, physician orders and progress notes; social history, history and physical, medication lists and medication administrative records, and incident reports; restraint, seclusion records, individual habilitation plans, behavior management programs, Woodward Resource Center policies, procedures, directives and guidelines in effect at the time of death and subsequent to death, communication with Woodward Resource Center staff regarding Mr. Tielebein's treatment and death; access to all areas of the Woodward Resource Center; access to communication with other consumers at the Woodward Resource Center; and access to other records and information necessary to complete this investigation.

Dr. Davis told the Iowa P & A staff they could conduct interviews of residents and staff.

During the investigation, Iowa P & A experienced difficulty in obtaining information. This was due in part to the fact that most of the residents of 109 Franklin at Woodward have severe and profound mental retardation and could not assist with the investigation. In addition, the other individuals who were interviewed did not witness the restraint and emergency measures.

**Woodward Internal Investigation Report**

On July 6, 2001, Iowa P & A sent a letter to Dr. Davis requesting a copy of the internal investigation report of Mr. Tielebein's death. Dr. Davis responded by letter on July 23, 2001, stating he would not provide a copy of the internal investigation report. On July 30, 2001, Iowa P & A sent Dr. Davis a second request for a copy of the report.

On August 15, 2001, Iowa P & A met with Gordon Allen, the Deputy Attorney General, and Jessie Rasmussen, the Executive Director of DHS, to discuss in part the Woodward internal investigation report. At that time, Mr. Allen indicated he had advised Dr. Davis not to produce a copy of the report.

On September 13, 2001, Iowa P & A sent a letter to Mr. Allen requesting a copy of the report. Iowa P & A did not receive a response, so it sent second letter to Mr. Allen requesting the report on October 13, 2001.

On October 19, 2001, Iowa P & A sent a letter to Ms. Rasmussen requesting a copy of the report. Ms. Rasmussen responded by letter on November 19, 2001, stating the "Randall Hines" report would not be produced because it was prepared in anticipation of litigation with the Department of Justice, at the direction of Mr. Allen.

The parties met on December 14, 2001. At that time Sally Cunningham, the Deputy Director for Field Operations for DHS, indicated DHS would produce a copy of report. The report has not been produced to date.

## DIA Investigative Report

On July 6, 2001, Iowa P & A contacted Ms. Bennett and requested a copy of the DIA's investigative report regarding Mr. Tielebein's death. Ms. Bennett stated she had conferred with Melissa Biederman of the Attorney General's Office, and she would not produce the full report because Iowa P & A was not authorized to receive the report under Iowa Code section 235B.6. Ms. Bennett did indicate she would produce the deficiencies noted by DIA and the corrective action plan to be implemented at Woodward. Iowa P & A later received a report of the deficiencies noted by DIA. The report listed the following deficiencies (1) Woodward staff did

not explain the risks involved with physical restrains properly to Mr. Tielebein's guardian prior to obtaining the signed consent for restraints; and (2) Mr. Tielebein's behavioral plan was not followed prior to implementing restraints, nor was there proper monitoring of Mr. Tielebein while he was restrained.

On July 11, 2001, Iowa P & A sent a letter to Ms. Biederman and Ms. Bennett, requesting the complete DIA report. Ms. Biederman responded by letter on September 4, 2001, indicating Iowa P & A was not authorized to receive the report under Iowa Code section 235B.6. On September 11, 2001, Iowa P & A again requested a copy of the report, stating that Iowa Code section 235B.6 is preempted by the PADD Act, 42 U.S.C. section 15001, *et seq.*, and the PAIMI Act, 42 U.S.C. section 10801, *et seq.*

On October 4, 2001, Marvin Tooman, Administrator for the DIA sent a letter to Iowa P & A indicating the full DIA report would not be produced as "[c]hapter 135C.17 contains an express limitation that requires DIA to cooperate with reasonable requests for information only 'as required by federal law and this chapter'", and stating that Iowa P & A must gather materials through its "own investigation". The DIA report has not been produced to date.

## I. STATUTORY AUTHORITY PROVIDING IOWA P & A ACCESS TO RECORDS OF PERSONS WITH DEVELOPMENTAL AND MENTAL HEALTH DISABILITIES PERTAINING TO INVESTIGATIONS OF ABUSE AND NEGLECT

The PADD Act was enacted by Congress in response to the inhumane and despicable conditions which had been discovered at New York's Willowbrook State School for persons with developmental disabilities "to protect the human and civil rights of this vulnerable population." Ala. Disabilities Advocacy Program v. Tarwater Dev. Ctr., 97 F.3d 492, 494 (11th Cir. 1996); Wis. Coalition for Advocacy v. Czaplewski, 131 F. Supp. 2d 1039, 1045 (E.D. Wis. 2001)

(citing to earlier version of the PADD Act). As a result, Congress enacted the PADD Act to provide for allotments to support a protection and advocacy system in each State to protect the legal and human rights of individuals with developmental disabilities." 42 U.S.C. § 15041 (2000).

Subsequent to the PADD Act, Congress enacted the PAIMI Act to provide for state allotments to establish protection and advocacy systems to "(A) protect and advocate the rights of individuals with mental illness; and (B) investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred." Id. § 10803.

The State of Iowa has designated Iowa P & A as an appropriate agency for conducting such independent investigations. (Complaint ¶ 10). Under the PADD Act Iowa P & A is to:

> (B) have authority to investigate incidents of abuse and neglect of individuals with developmental disabilities if the incidents are reported to the system, or if there is probable cause to believe that the incidents occurred.
>
> . . .
>
> (I) have access to all records of-
> (i) any individual with a developmental disability who is a client of the system if such individual, or the legal guardian, conservator, or other legal representative of such individual, has authorized the system to have such access;
> (ii) any individual with a developmental disability, in a situation in which -
> > (I) the individual, by reason of such individual's mental or physical condition, is unable to authorize the system to have such access;
> > (II) the individual does not have a legal guardian, conservator, or other legal representative, or the legal guardian of the individual is the State; and
> > (III) a complaint has been received by the system about the individual with regard to the status or treatment of the individual or, as a result of monitoring or other activities, there is probable cause to believe that such individual has been subject to abuse or neglect; and

(iii) any individual with a developmental disability in a situation in which --

(I) the individual has a legal guardian, conservator, or other legal representative;

(II) a complaint has been received by the system about the individual with regard to the status or treatment of the individual or, as a result of monitoring or other activities, there is probable cause to believe that such individual has been subject to abuse and neglect;

(III) such representative has been contacted by such system, upon receipt of the name and address of such representative;

(IV) such system has offered assistance to such representative to resolve the situation; and

(V) such representative has failed or refused to act on behalf of the individual;

(J)(i) have access to the records of individuals described in subparagraphs (B) and (I), and other records that are relevant to conducting an investigation, under circumstances described in those subparagraphs, not later than 3 business days after the system makes a written request for the records involved; and

(ii) **have immediate access, not later than 24 hours** after the system makes such a request, to the records **without consent from another party,** in a situation in which services, supports, and other assistance are provided to an individual with a developmental disability--

(I) if the system determines there is probable cause to believe that the health or safety of the individual is in serious and immediate jeopardy; or

(II) **in the case of death of an individual with a developmental disability;** . . .

Id. § 15043. The PAIMI Act provides similar access and authority in 42 U.S.C. section 10805.

Under the PAIMI Act, Iowa P & A is required to maintain the confidentiality of records required by Federal and State law to be maintained in a confidential manner as required by a provider of mental health services. Id. § 10806.

8

## II. DEFENDANTS HAVE VIOLATED 42 U.S.C. SECTION 1983 BY THEIR REFUSALS TO PROVIDE IOWA P & A ACCESS WITH NECESSARY INVESTIGATIVE MATERIALS

Iowa P & A alleges that Defendants, operating under color of state law, have violated the PADD and PAIMI Acts through their refusals to provide Iowa P & A with access to records regarding the investigation of Mr. Tielebein's death. 42 U.S.C. section 1983 provides a cause of action for violations of federal statutes under state law. See Maine v. Thiboutot, 448 U.S. 1 (1980). Violations of federal statutes are not redressable under section 1983 if: (1) Congress has foreclosed enforcement of a statute in the statute's enactment, a plaintiff is precluded from bringing a cause of action under section 1983, Wright v. City of Roanoke Redevelopment & Hous. Auth., 479 U.S. 418, 423 (1987); or (2) if the federal statute does not "create enforceable rights, privileges, or immunities within the meaning of § 1983." Cannon v. Univ. of Chicago, 441 U.S. 677, 703 (1979). Neither of these two exceptions apply to this case.

Congress has not expressly foreclosed the right to bring a section 1983 action under either the PADD or PAIMI Acts. In addition, neither Act demonstrates an intent by Congress to foreclose the right to bring a section 1983 action. To the contrary, both the PADD and PAIMI Acts authorize Iowa P & A to pursue legal remedies against State actors. 42 U.S.C. §§ 10807, 15044(b)(1).

Defendants contend that Iowa P & A has failed to exhaust administrative remedies. The PAIMI Act requires Iowa P & A to exhaust administrative remedies "where appropriate".[2] Id. § 10807. This provision also provides that if Iowa P & A determines that "any matter with respect to such individual will not be resolved within a reasonable time, the system. . . may pursue

---

[2] The PADD Act does not contain any similar requirement.

9

alternative remedies, including the initiation of legal action." Id. For over nine months Iowa P&A worked with Defendants in an attempt to receive the information necessary to complete its investigation into Mr. Tielebein's death. Iowa P & A has a statutory right to access these records. 42 U.S.C. §§ 10805; 15043. It is evident that nine months is not a "reasonable" duration of time. As a result, under the PAIMI Act, Iowa P & A exhausted administrative remedies.

The denials of access occurred while Defendants were acting under the color of state law.Because Congress intended for Iowa P & A to be able to initiate legal action against state actors, Iowa P & A is not precluded from bringing this action pursuant to section 1983.

**III.  DEFENDANTS TECHAU AND TOOMAN HAVE VIOLATED THE PADD AND PAIMI ACTS BY REFUSING TO PRODUCE THE FULL DIA REPORT REGARDING TIELEBEIN'S DEATH**

Defendants Techau and Tooman argue that they are prohibited from releasing information regarding the full DIA report surrounding Mr. Tielebein's death because the report was unfounded. Defendants contend that Iowa Code section 235B.6 precludes them from releasing such information. Defendants' argument is without merit because Iowa Code section 235B.6 is preempted by the PADD and PAIMI Acts.

"The Supremacy Clause found in U.S. Const., Art. VI, cl.2 invalidates state laws which 'interfere with, or are contrary to,' federal law." Hillsborough County v. Automated Med. Labs., Inc., 417 U.S. 707, 712 (1985) (quoting Gibbons v. Ogden, 22 U.S. 1 (1824)).

In determining whether federal law preempts a state statute, the United States Supreme Court follows several basic governing tenants. First, the Supreme Court follows "the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless

that was the clear and manifest intent by Congress." <u>Medtronic, Inc. v. Lohr</u>, 518 U.S. 470, 485 (1996) (quoting <u>Rice v. Santa Fe Elevator Corp.</u>, 331 U.S. 218, 230 (1947)). The Court is guided by the principal that "'[t]he purpose of Congress is the ultimate touchstone' in every preemption case." <u>Id.</u> (quoting <u>Retail Clerks v. Schermerhorn</u>, 375 U.S. 96, 103 (1963)). Therefore, "any understanding of the scope of a pre-emption statute must rest primarily on a 'fair understanding of *congressional purpose*.'" <u>Id.</u> at 485-86 (quoting <u>Cipollone v. Liggett Group, Inc.</u>, 505 U.S. 504, 530 n.27 (1992)). Second, the Court determines the intent of Congress from the language of the statute and the surrounding "statutory framework". <u>Id.</u> at 486 (quoting <u>Gade v. Nat'l Solid Wastes Management Ass'n</u>, 505 U.S. 88, 111 (1992). In accordance with this principal the Court looks to "'structure and purpose of the statute as a whole,' as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." <u>Id.</u> (quoting <u>Gade,</u> 505 U.S. at 111).

The intent of Congress to preempt a state statute can either be express or implied. <u>See</u> <u>Symens v. Smithkline Beecham Corp.</u>, 152 F.3d 1050, 1053 (8th Cir. 1998). The PAIMI Act contains an express preemption provision. <u>See</u> 42 U.S.C. § 10806(a); <u>Advocacy Ctr. v. Stalder</u>, 128 F. Supp. 2d 358, 366-67 (M.D. La. 1999). In <u>Stalder</u>, the defendants argued that they were not required to produce mental health records of prisoners pursuant to a state statute. <u>See</u> <u>Stalder</u>, 128 F. Supp. 2d at 366-67. The court then turned to the text of the PAIMI Act, which provides:

> If the laws of a State prohibit an eligible system from obtaining access to the records of individuals with mental illness in accordance with section 10805(a)(4) of this title and this section shall not apply to such system before --
> (i) the date such system is no longer subject to the prohibition; or

          (ii) the expiration of the 2-year period beginning on May 23, 1986, whichever occurs first.

42 U.S.C. § 10806(b)(2)(C). The court held that the state statute was expressly preempted by the PAIMI Act. See Stalder, 128 F. Supp. 2d at 367 (concluding the provision expressed the clear intent of Congress to preempt state laws which would prevent the eligible system's right to access medical records); accord Okla. Disability Law Ctr., Inc. v. Dillon Family & Youth Servs., Inc., 879 F. Supp. 1110, 1112 (N.D. Okla. 1995).

       Assuming arguendo the Court determines Congress has not expressly defined its intent to preempt Iowa Code section 235B.6, Congress has impliedly preempted the statute. Implied preemption can occur "'where a [state] law stands as an obstacle to the accomplishment of the full purposes and objective of Congress, preemption occurs." United of Omaha v. Business Men's Assurance Co. of Am., 104 F.3d 1034, 1040 (8th Cir. 1997) (quoting John Hancock Mut. v. Harris Trust & Sav. Bank, 510 U.S. 86, 98 (1993)). Implied preemption can also occur "when federal law is so pervasive that it reflects an intent to occupy a regulatory field." Symens, 152 F.3d at 1053 (citing Heart of Am. Grain Inspection Serv., Inc. v. Mo. Dep't of Agric., 123 F.3d 1098, 1103 (8th Cir. 1997)). In this case Iowa Code section 235B.6 actually conflicts with both the PADD and PAIMI Acts, therefore the statute is preempted.

       Defendants contend Iowa Code section 235B.6 is in accord with the PADD and PAIMI Acts because both permit access to information pertinent to abuse, by focusing on the definition of "abuse" from the PAIMI Act. Defendant's focus on the "abuse" definition is misplaced. Contrary to the assertion of Defendants, Iowa Code section 235B.6 directly conflicts with the PADD and PAIMI Acts.

Even though Defendants have concluded no abuse occurred Iowa P & A still has the right to timely access to the complete report as part of its investigation. The proper focus for the inquiry into Iowa P & A's authority is through definition of "record". The PADD Act defines the term "record" as follows:

> In this section, the term "record" includes --
> (1) a report prepared or received by any staff at any location at which services, supports, or other assistance is provided to individuals with developmental disabilities;
> (2) a report prepared by an agency or staff person charged with investigating reports of incidents of abuse or neglect, injury, or death occurring at such location, that describes such incidents and the steps taken to investigate such incidents; and
> (3) a discharge planning record.

42 U.S.C. § 15043(c).[3] Clearly, the express wording of the PADD Act contemplates that Iowa P & A is entitled to access to the report of the agency charged with investigating the report of Mr. Tielebein's death, the DIA. This definition does not limit the term "record" to founded abuse reports. Therefore, there is an actual conflict between the PADD Act and the Iowa statute.

Throughout the PADD Act, Congress' intent that the DIA should freely exchange information with Iowa P & A is prevalent. For example, the PADD Act contemplates that the DIA will share information with Iowa P & A as follows:

---

[3] The PAIMI Act is in accord with the PADD Act, defining "records" as follows:

> "records" includes reports prepared by any staff of a facility rendering care and treatment or reports prepared by an agency charged with investigating reports of incidents of abuse, neglect, and injury occurring at such facility that describe incidents of abuse, neglect, and injury occurring at such facility and the steps taken to investigate such incidents, and discharge planning records.

Id. § 10806(b) (3)(A).

(3) to the extent that information is available, the State shall provide to the system --
    (A) a copy of each independent review, pursuant to section 1396a(a)(30)(C) of this title, of an Intermediate Care Facility (Mental Retardation) within the state, not later than 30 days after the availability of such a review; and
    (B) information about the adequacy of health care and other services, supports, and assistance that individuals with developmental disabilities who are served through home and community based waivers (authorized under section 1396n(c) of this title) receive; . . .

42 U.S.C. § 15043(a)(3).

Moreover, the very purposes behind both Acts show the need for Iowa P & A to have ready access to the documents. The PADD Act expresses the need for advocacy on behalf of individuals with developmental and mental health disabilities as they "are at greater risk than the general population of abuse, neglect, financial and sexual exploitation, and the violation of their legal and human rights." 42 U.S.C. § 15001, *et seq.* This is in accord with the PAIMI Act, which describes the purpose of Iowa P & A as to "protect and advocate" for the rights of persons with mental illness, and "investigate incidents of abuse and neglect" if such incidents are reported or where there is probable cause to believe the incidents occurred. 42 U.S.C. § 10801.

Given the PAIMI Act provides for express preemption, and the state statute is in direct conflict with both Acts, the Court should conclude that Iowa Code section 235B.6 is preempted by the PADD and PAIMI Acts.

## IV. DEFENDANTS RASMUSSEN AND DAVIS HAVE VIOLATED THE PADD AND PAIMI ACTS BY REFUSING TO PRODUCE THE RANDALL HINES REPORT AND THE MINUTES OF STAFF DISCUSSION

### A. The Hines Report is Not Entitled to Attorney Work Product Protection

Iowa P & A did not possess independent knowledge of the existence of the Randall Hines

(hereinafter "Hines report"),[4] rather Defendants told Iowa P & A of the existence of the report. Defendants contend the Hines report was prepared in anticipation of other litigation with the United States Department of Justice pursuant to a notice of investigation sent to the Iowa Governor and Attorney General on March 22, 1999, indicating that it would be initiating an investigation of both Woodward and Glenwood Resource Center for alleged violations of the Civil Rights of Institutionalized Persons Act, 42 U.S.C. section 1997a. (Resistance at ¶ 15). Defendants allege that the Hines report is privileged and confidential and only mentions Mr. Tielebein by coincidence and by example. (Resistance at ¶ 17). Defendants assertions are incorrect because the Hines report is not attorney work product, and even if it is Defendants have waived any protection afforded, and Iowa P & A have a substantial need for the report.

This case is premised on federal question jurisdiction, therefore, federal common law governs the evidentiary privileges, rather than state law. See Maertin v. Armstrong World Indus., Inc., 172 F.R.D. 143, 147 (D.N.J. 1997). The work product doctrine is governed by the federal law which embodies Federal Rule of Civil Procedure 26(b)(3). See id. Rule 26(b)(3) provides:

> A party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative . . . only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.

---

[4] It should be noted for the record that Iowa P & A has only requested a copy of the Hines Report pertaining to Woodward Resource Center. The report prepared for Glenwood Resource Center is not relevant to this action.

While the doctrine extends to materials prepared prior to the commencement of litigation, the scope of the protection is limited to the time in which "a real and substantial probability of litigation exists." Guy v. United Healthcare Corp., 154 F.R.D. 172, 181 (S.D. Ohio 1993). The work product doctrine provides a qualified, not an absolute protection, and may be waived. See Maertin, 172 F.R.D. at 148.

The party asserting the protection of a privilege bears the burden of establishing the facts necessary to establish the privileged relationship. See Bowne v. AmBase Corp., 150 F.R.D. 465 (S.D.N.Y. 1993) (quoting von Bulow v. von Bulow, 811 F.2d 136, 144 (2d Cir. 1987)). To meet this burden of proof, Defendants must establish: (1) that the Hines report is a document; (2) prepared in anticipation of litigation; and (3) the Hines report was prepared by or for Defendants' attorneys. See Ennis v. Anderson Trucking, 141 F.R.D. 258, 259 (E.D.N.C. 1991) (citing City v. Consumer Servs., Inc. v. Horne, 100 F.R.D. 740, 747 (D. Utah 1983). If Defendants' meet their burden of proof, then Iowa P & A must establish it has a substantial need for the Hines report. See id. "A substantial need for work product materials exists where the information sought is 'essential' to the party's defense, is 'crucial' to the determination of whether the defendant could be held liable for the acts alleged, or carries great probative value on contested issues." Nat'l Congress for Puerto Rican Rights v. City of New York, 194 F.R.D. 105, 108 (S.D.N.Y. 2000).

1. Defendants Have Not Proven the Hines Report was Prepared in Anticipation of Litigation

Defendants have not met their burden of proving the Hines report was prepared in anticipation of litigation. Defendants allege the United States Department of Justice was initiating an investigation of Woodward Resource Center and Glenwood Resource Center in March of 1999. It has been nearly two years since Defendants allegedly received notice of the

Department of Justice's intent to investigate at both facilities. Defendants have not met their burden of proof, as they can point to no suit which has been initiated.

The evidence presented to the Court by Defendants establishes that an investigation was commenced at Woodward and Glenwood in anticipation of an investigation by the United States Department of Justice. The issue is whether the Hines report, prepared in anticipation of a federal agency investigation is equivalent to anticipation of litigation for purposes of Federal Rule of Civil Procedure 26(b)(3).

In Guzzino v. Felderman, the court considered this issue with respect to documents prepared by Dean Whitter as part of an internal audit in anticipation of federal regulatory investigations by the SEC and NASD. See Guzzino v. Felderman, 174 F.R.D. 59, 63 (W.D. La. 1997). In that case the court noted that general principal that materials produced in the ordinary course of business are excluded from the work product doctrine. See id. The court then found that the evidence presented by Dean Witter indicated that the investigation was done in the ordinary course of business, and/or to prepare of potential investigations of the SEC and NASD. See id. Based on this evidence, the court concluded the documents were not immune from discovery under the guise of attorney work product. Id.

As in Guzzino, Defendants' evidence reveals that the Hines report was prepared in anticipation of an investigation by the Department of Justice. Just as in that case, the fact that the activities which lead to Mr. Tielebein's death may result in litigation in federal or state court does not cloak the documents with immunity from disclosure in this proceeding. Rather, documents prepared in anticipation of a federal investigation are not afforded attorney work product protection.

2.     <u>Even if the Court Determines that the Hines Report is Attorney Work Product, Defendants have Waived any Protection Afforded to the Report</u>

On December 14, 2001, Sally Cunningham, the Deputy Director for Field Operations from DHS indicated that DHS would produce a copy of the Randall Hines report. Ms. Cunningham's acts serve as a waiver of the attorney work product protection afforded to Defendants. <u>Cf.</u> <u>Bowne</u>, 150 F.R.D. at 478-79 (noting waiver in prior lawsuit constituted waiver in present litigation).

3.     <u>Iowa P & A has a Substantial Need for the Hines Report</u>

Even if the Court determines the report is attorney work product, and that Cunningham's acts did not waive any protection afforded to the Hines report, the report should be produced based on substantial need. While Defendants contend the Hines report does not specifically relate to Mr. Tielebein's death, it should be noted that at page 21 of the documents produced by Defendant Rasmussen with her November 19, 2001 letter, provides in part:

> Both Mike and Larry stated following the demonstration that there was considerable pressure placed on them in this manner by Sharon and that they found it not possible to move or raise their head even when exerting considerable force. Randall Hines indicated this was not a technique that should be used. Jon William's and Larry Pezley also indicated the technique Sharon Demonstrated (sic) was not a technique that we teach or have ever taught in restraint or Mandt training here at WRC. PSE II Larry Pezley advised that on Wednesday, May 2, 2001 during his exit, Randall Hines stated that Sharon did put pressure on the head to "immobilize the head."

This summary of Hines' involvement with the investigation into Mr. Tielebein's death seems to contradict Defendants assertion that the report mentions Mr. Tielebein by mere coincidence and example. It is evident based on the limited information provided by Defendants that in preparing his report, Hines discussed Mr. Tielebein's death with staff and made determinations regarding

the restraint procedures used by the Woodward staff, which ultimately lead to his death. This information is directly relevant to the request at hand.

As discussed in Section III of this Memorandum the information contained in the Hines report falls within the definitions of records prepared with regard to Mr. Tielebein's death.

Hiring a consultant to replicate the information contained in the Hines report would be burdensome and costly. The consultant would have to meet with all individuals involved in the investigation, and recreate the scenario which lead to Mr. Tielebein's death. In addition, memories fade and people move on. It has been nearly a year since Mr. Tielebein died while being restrained at Woodward. Defendants have already conducted their own, complete investigation into his death. Therefore, the Court should order Defendants to produce the Hines report to Iowa P & A. See Nat'l Congress for Puerto Rican Rights, 194 F.R.D. at 108 (ordering defendants to produce documents where plaintiffs met their burden of proving that "replicating the data through other sources would be burdensome and costly"); cf. Horan v. Sun Co., Inc., 152 F.R.D. 437, 439 (D.R.I. 1993) (concluding the plaintiff's environmental tests contain relevant, non-privileged facts, and do not contain the "thought processes or mental impressions of plaintiff's counsel", and finding that the site conditions had changed warranted production of the information which was essential and crucial to the outcome of the case).

**B.     The Minutes of the Staff Discussions are not Privileged and Confidential**

Defendants contend the minutes of staff discussions must remain confidential and privileged as subsequent remedial efforts to improve the quality of care. The Third Circuit Court of Appeals has recently addressed whether protection and advocacy systems have the right to access similar information with respect to peer review reports. See Pa. Protection & Advocacy

v. Houstoun, 228 F.3d 423 (3d Cir. 2000). In Houstoun a patient with mental illness attempted suicide at Allentown State Hospital (hereinafter "Allentown"), and died four days later. Id. at 425. The supervisor of the hospital appointed two peer review committees to "evaluate the circumstances" of the patient's death. Id. The committees prepared two peer review reports which were intended to "identify any mistakes that were made and that could have been avoided and any changes that could be made in the hospital's policy or practices so as to reduce the likelihood of similar events in the future." Id.

The defendants in Houstoun argued: (1) section 10806(b)(3)(A) requires disclosure of "incident reports", but not peer review reports; (2) the reports were "not a record 'of any individual'" because the reports belonged to Allentown; and (3) even if the reports were the records of an individual, the PAIMI Act did not require the plaintiff to be given access to the records because Pennsylvania law restricts the disclosure of peer review reports. Id. at 426-27. The court rejected the defendants' contentions, finding: (1) the plain language of the definition of "record" under PAIMI included peer review reports; (2) many of the records concerning the patient were just as much Allentown's property as the peer review report, and that the statute required the defendants to provide the plaintiff with access to the records; and (3) because some states have laws prohibiting disclosure of peer review reports and other states do not, the language of the statute could not be reasonably construed "to encompass identical peer review reports in some states but not others." Id.

While Defendants contend the "minutes" of staff discussions are outside the scope of Iowa P & A's original request and its subsequent reiterations, Iowa P & A's original request is broad enough to encompass the minutes. Moreover, as stated in Houstoun, similar "peer review"

information must be produced as a record of Mr. Tielebein's death in accordance with the PAIMI and PADD Acts. See id. at 428 (concluding PAIMI preempts any state law which would grant a health care facility from denying a protection and advocacy system access to peer review reports). The plain language of both Acts contemplates that Iowa P & A will have access to the records prepared by the facility in regard to Tielebein's death.

**V.    THE COURT SHOULD ISSUE INJUNCTIVE RELIEF BECAUSE IOWA P & A HAS PROVEN THE MERITS OF ITS CLAIMS, THE HARM TO IOWA P & A OUTWEIGHS THE HARM TO DEFENDANTS, AND PRODUCTION OF THE MATERIALS TO IOWA P & A IS IN ACCORD WITH THE PUBLIC INTEREST**

Iowa P & A seeks both temporary and permanent injunctive relief to restrain Defendants from interfering with its ability to access records. Iowa P & A bears the burden of proving that it is entitled to injunctive relief. See Baker v. Electric Co-op v. Chaske, 28 F.3d 1466, 1472 (8th Cir. 1994) (case involving request for preliminary injunction). In determining whether a preliminary injunction should issue, the Court should consider: (1) Iowa P & A's likelihood of success on the merits; (2) the threat of irreparable harm to the to Iowa P & A; (3) the balance between the harm to Iowa P & A and the harm other interested parties would experience if the injunction were granted; and (4) whether the granting of the injunction is in the public interest. U.S. Ecology, Inc. v. State of Nebraska, 210 F.3d 887, 898 (8th Cir. 2000). "In the absence of a compelling need, a party applying for a permanent injunction must prove not only the merits of its case but also the act complained of will take place if it were not for this remedy and any inequity suffered by the defendants is outweighed by the need for injunctive relief." Stalder, 128 F. Supp. 2d at 367 (citing Younger v. Harris, 401 U.S. 37, 43-44 (1971); CIBA-GEIGY Corp. v. Bolar Pharm. Co., 747 F.2d 844, 850 (3d Cir. 1984)).

In this case, Iowa P & A has proven it has no adequate remedy available other than injunctive relief. Iowa P & A has proven the merits of its case as expressed in Sections 2-4 of this Memorandum. Clearly, if Iowa P & A does not receive the documents requested, it cannot fully comply with its federal mandates under the PADD and PAIMI Acts to investigate Larry Mr. Tielebein's death. See 42 U.S.C. §§ 10803; 15041.

Defendants will not be harmed by forcing them to comply with the provisions of the PADD and PAIMI Acts, both of which were adopted by Congress, which acts for the public interest. Furthermore, the issuance of an injunction in this case will not subject Defendants to a penalty or hardship because the injunction merely requires Defendants to comply with the PADD and PAIMI Acts. See Stalder, 128 F. Supp. 2d at 368. For these reasons, the Court should grant Iowa P & A's request for temporary and permanent injunctive relief.

## CONCLUSION

The Court should grant Plaintiff, Iowa Protection and Advocacy Services, Inc.'s request for declaratory and injunctive relief because Plaintiff has proven the merits of its claims, the harm Plaintiff will experience if the documents are not produced is greater than the harm to Defendants, and production of the documents is in accord with the public interest as expressed in the PADD and PAIMI Acts. For these reasons the Court should enter judgment in favor of Plaintiff, award attorney fees to Plaintiff, and assess costs to Defendants.

_(signature)_

Sharon K. Malheiro
Heather L. Palmer
DAVIS, BROWN, KOEHN,
   SHORS & ROBERTS, P.C.
666 Walnut Street, Suite 2500
Des Moines, Iowa 50309-3993

ATTORNEYS FOR PLAINTIFF

ORIGINAL FILED.

COPIES TO:

Gordon Allen
IOWA DEPARTMENT OF JUSTICE
Hoover Building
Des Moines, Iowa 50319

ATTORNEY FOR DEFENDANTS
RASMUSSEN AND DAVIS

Jean Davis
IOWA DEPARTMENT OF JUSTICE
Hoover Building
Des Moines, Iowa 50319

ATTORNEY FOR DEFENDANTS
TECHAU AND TOOMAN

PROOF OF SERVICE

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on _February 15_, 2002, by:

ρ US Mail           ρ FAX
ρ Hand Delivered    ρ Overnight Courier
ρ Federal Express    ρ Other:

Signature: _(signature)_