FILED 3/12/2002 2:46:00 PM, USDC, Southern District of Iowa

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | |
|---|---|
| IOWA PROTECTION AND ADVOCACY SERVICES, INC., <br><br> Plaintiff, <br><br> v. <br><br> JESSIE K. RASMUSSEN, Director Iowa Department of Human Services; MICHAEL J. DAVIS, Superintendent of Woodward Resource Center; KEVIN TECHAU, Director Iowa Department of Inspections and Appeals; MARVIN TOOMAN, Administrator Iowa Department of Inspections and Appeals, <br><br> Defendants. | 4-02-CV-90004 <br><br><br><br><br><br><br><br><br><br> MEMORANDUM OPINION AND ORDER |

Plaintiffs bring this action for a preliminary and permanent injunction requiring the Defendants to produce copies of records regarding the death of a former resident of the Woodward Resource Center located in Woodward, Iowa in Boone County. For the reasons set forth below, the motion is granted.

## I.      Facts

Iowa Protection and Advocacy Services, Inc. ("Iowa P&A") is a private, non-profit Iowa corporation which provides protection and advocacy services to persons with mental retardation and mental illness pursuant to the Developmental Disabilities Assistance and Bill of Rights Act of 2000 ("PADD Act"), 42 U.S.C. § 15001, *et seq.*, and the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI Act"), 42 U.S.C. § 10801, *et seq.*

The Woodward Resource Center ("Woodward") is a certified health care facility serving persons with mental retardation. Larry Tieleban was a resident of Woodward in March 2001 and died of suffocation on March 18, 2001 while being restrained by Woodward employees. Mr. Tielebein is a person with developmental and mental illness disabilities within the meaning of the PADD Act and the PAIMI Act. The medical examiner conducted an autopsy of Mr. Tielebein, and later classified the death as homicide.

On March 20, 2001, a member from the media contacted Iowa P&A and reported the death at Woodward. Iowa P&A responded by contacting Dr. Michael Davis, the Superintendent for Woodword, for information regarding the reported death. Dr. Davis stated that Mr. Tielebein died while he was restrained. Dr. Davis also indicated that he had obtained statements from employees and would be interviewing staff regarding Mr. Tielebein's death. That same day, March 20, Iowa P&A contacted the Iowa Department of Inspections and Appeals ("DIA") to report the death and ask whether they were conducting an investigation.

On March 22, 2001, staff from Iowa P&A went to Woodward to investigate Mr. Tielebein's death. Upon arriving at Wooward, the Iowa P&A staff presented Dr. Davis with a letter outlining Iowa P&A's federal authority to investigate Mr. Tielebein's death, and which requested the following information:

> any and all records of Larry Tielebein and all other individuals placed within your facility including but not limited to treatment plans, nursing and other staff progress notes, physician orders and progress notes; social history, history and physical, medication lists and medication administrative record, and incident reports; restraint, seclusion records, individual habitation plans, behavior management programs, Woodward Resource Center policies, procedures, directives and guidelines in effect at the time of death and subsequent to death, communication with Woodward Resource Center staff regarding Mr. Tielebein's treatment and death; access to all areas of the Woodward Resource Center; access

to communication with other consumers at the Woodward Resource Center; and
access to other records and information necessary to complete this investigation.

Dr. Davis told the Iowa P&A staff they could conduct interviews of residents and staff.

During the investigation, Iowa P&A experienced difficulty in obtaining information.

This was due in part to the fact that most of the residents of 109 Franklin at Woodward have

severe and profound mental retardation and could not assist with the investigation.  In addition,

the other individuals who were interviewed did not witness the restraint and emergency

measures.

## A.      DIA Investigative Report

On March 19, 2001, DIA initiated an investigation regarding the circumstances of Mr.

Tielebein's death for the purposes of determining whether Mr. Tielebein's death involved either

an act of dependent adult abuse or non-compliance with the certification requirements.  On

March 21, 2001, Rhonda Bennett from the DIA contacted Iowa P&A and stated that someone

from the DIA would be sent out to investigate Mr. Tielebein's death.

DIA is the state agency responsible for the licensing, inspection, and regulatory oversight

of Iowa health care facilities.  DIA is also "solely responsible for the evaluation and disposition

of dependent adult abuse cases within health care facilities . . ."  Iowa Code § 235B.3 (2001).  In

addition, DIA is the state agency responsible for determining whether health care facilities

certified for participation in federally funded programs have satisfied the required conditions of

participation.  Detected noncompliance with the federal certification requirements are

communicated in writing in a report detailing the findings referred to as the "Statement of

Deficiencies."

When conducting an investigation of dependent adult abuse or non-compliance with the federal certification standards, DIA uses a preponderance of the evidence standard. The results of a dependent adult abuse investigation are classified as "founded" (i.e. the preponderance of the evidence establishes that an alleged act of dependent abuse occurred) and "unfounded" (i.e. the preponderance of the evidence establishes that an alleged act of dependent adult abuse did not occur).

The DIA investigation concluded on or about April 26, 2001. DIA determined that the preponderance of the evidence established that the allegation of dependent adult abuse was unfounded and further determined that Woodward was non-compliant with certain federal certification requirements. The DIA's unfounded findings regarding the allegation of dependent adult abuse were filed with the Department of Human Services in accordance with state law.

On July 6, 2001, Iowa P&A contacted Ms. Bennett and requested a copy of the DIA's investigative report regarding Mr. Tielebein's death. DIA provided Iowa P&A with a complete copy of the Statement of Deficiencies regarding DIA's findings of noncompliance arising from the treatment provided to Mr. Tielebein; however, it did not provide a copy of DIA's findings regarding the allegation of dependent adult abuse investigated. DIA, acting through their legal counsel, Melissa Biederman of the Attorney General's office, advised Iowa P&A that DIA could not comply with this portion of Iowa P&A's request due to the prohibition found in Iowa Code § 235B.6(2).

The Statement of Deficiencies listed the following deficiencies: (1) Woodward staff did not explain the risks involved with physical restraints properly to Mr. Tielebein's guardian prior to obtaining the signed consent for restraints; and (2) Mr. Tielebein's behavioral plan was not

followed prior to implementing restraints, nor was there proper monitoring of Mr. Tielebein while he was restrained.

On July 11, 2001, Iowa P&A sent a letter to Ms. Bennett and Ms. Biederman, requesting the complete DIA report. Ms. Biederman responded by letter on September 4, 2001, indicating Iowa P&A was not authorized to receive the report under Iowa Code § 235B.6, which does not authorize the release of "*unfounded* dependent adult abuse information" to Iowa P&A. Iowa Code § 235B.6 (emphasis added). On September 11, 2001, Iowa P&A again requested a copy of the report, stating that Iowa Code § 235B.6 is preempted by the PADD Act 42 U.S.C. § 15001, *et seq.*, and the PAIMI Act, 42 U.S.C. § 10801, *et seq.* On October 4, 2001, Marvin Tooman, Administrator for the DIA sent a letter to Iowa P&A indicating the full DIA report would not be produced as "[c]hapter 135C.17 contains an express limitation that requires DIA to cooperate with reasonable requests for information only 'as required by federal law and this chapter,'" and stating that Iowa P&A must gather materials through its "own investigation." Iowa P&A now seeks the report by court order through preliminary and permanent injunction.

## B.     Woodward Internal Investigation Report

On July 6, 2001, Iowa P&A sent a letter to Dr. Davis requesting a copy of the internal investigation report of Mr. Tielebein's death. Dr. Davis responded by letter on July 23, 2001, stating he would not provide a copy of the internal investigation report. On July 30, 2001, Iowa P&A sent Dr. Davis a second request for a copy of the report.

On August 15, 2001, Iowa P&A met with Gordon Allen, the Deputy Attorney General, and Jessie Rasmussen, the Executive Director of the Department of Human Services ("DHS"), to discuss in part the Woodward internal investigation report. At that time, Mr. Allen indicated that

-5-

he had advised Dr. Davis not to produce a copy of the report. On September 13, 2001, Iowa P&A sent a letter to Mr. Allen requesting a copy of the report. Iowa P&A did not receive a response, so it sent a second letter to Mr. Allen requesting the report on October 13, 2001.

On October 19, 2001, Iowa P&A sent a letter to Ms. Rasmussen requesting a copy of the report. Ms. Rasmussen responded by letter on November 19, 2001, stating that, at the direction of Mr. Allen, the "Randall Hines" report would not be produced because it was prepared in anticipation of litigation with the Department of Justice. Ms. Rasmussen and Mr. Allen base their privilege claim on a letter that the United States Department of Justice ("DOJ") served upon the state in 1999 indicating that it would initiate an investigation, asserting that the report, known as the Hines Report, was prepared in response to that investigation. Mr. Allen contends that he hired Randall Hines, an expert on restraints, to reach findings independent of the DOJ's investigation regarding Woodward and another facility. Mr. Allen admits that part of the report addresses Mr. Tielebien's death, but Mr. Allen asserts that Mr. Tielebien's death is not the motivating factor behind the report nor its focus.

Mr. Allen acknowledged at the hearing on this matter that two years have passed since the DOJ investigation, although they have requested more documents recently. Furthermore, the only concrete evidence of a litigation threat that Mr. Allen has offered is the letter from the DOJ that cites, 42 U.S.C. § 1997. That statute says that upon investigation, DOJ may commence litigation after serving notice on the Governor, state attorney general, and the director of the institution.

### C.    The Minutes of the Woodward Mortality Review Meeting

Iowa P&A has also not received the minutes of the mortality review meeting conducted

by Woodward's professional staff (the "Minutes"), although it has received the report generated by that meeting.  Mr. Allen also claims that the work-product privilege that covers the Hines report covers the Minutes.  Mr. Allen has also refused to produce the Minutes on the grounds that their communications were 'privileged' and he quotes that they "must be able to speak freely, without fear of discipline or repercussions."  Mr. Allen is apparently quoting the professional employees' own statements at the meeting.

## II.     Preliminary and Permanent Injunction Standards

"The burden of establishing the propriety of a preliminary injunction is on the movant." *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir.1994).  District courts have broad discretion with respect to requests for preliminary injunctions, and are reviewed on a standard that allows reversal "only for clearly erroneous factual determinations, an error of law, or an abuse of that discretion." *United Indust. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir.1998)(citation omitted.).

The relevant factors in determining whether to grant a preliminary injunction are: "(1) the probability of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) whether the issuance of an injunction is in the public interest." *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 485-86 (8th Cir.1993) (citing *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir.1981) (en banc)).  These four factors are typically referred to as the "Dataphase factors." See, e.g., *Entergy, Ark., Inc.*, 210 F.3d at 893.  "The standard for granting a permanent injunction is essentially the same as for a preliminary injunction, except that to obtain a permanent injunction the movant must attain

success on the merits," rather than simply establish a likelihood of success.  *Bank One v. Guttau*, 190 F.3d 844, 847 (8th Cir.1999) (citing *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 546 n. 12, (1987)).

The Dataphase factors are not a rigid formula; however, "[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959).  "Thus, to warrant a preliminary injunction, the moving party must demonstrate a sufficient threat of irreparable harm." *Iowa Protection and Advocacy Serv., Inc. v. Gerard Treatment Programs*, 152 F.Supp.2d 1150, 1156 (N.D. Iowa 2001) (citing *Adam-Mellang v. Apartment Search, Inc.*, 96 F.3d 297, 299 (8th Cir.1996)); see also *Baker Elec. Co-op., Inc.*, 28 F.3d at 1472 ("No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance, they weigh towards granting the injunction. However, a party moving for a preliminary injunction is required to show the threat of irreparable harm.") (internal quotation marks and citations omitted).

## III.    Discussion

Upon examining past treatment of the Dataphase factors by other district courts in cases related to investigations by either Iowa P&A or comparable organizations in other states, it becomes clear that the decision must hinge on the first Dataphase factor: whether the case is meritorious or is likely to succeed on the merits.  First, this decision will address why the case law favors Iowa P&A on the other Dataphase factors.  Second, the Court will respectively address the merits for each of the three documents that Iowa P&A is seeking.

**A.     Other Dataphase Factors**

**1.     Irreparable Harm**

The questions of whether a failure to issue a preliminary injunction to produce the documents that Iowa P&A requests will cause irreparable harm is one that was addressed with respect to another preliminary injunction sought by Iowa P&A in the Northern District of Iowa. In *Iowa Protection and Advocacy Services*, the Court held that:

> [W]hether or not other investigations have already been conducted of alleged abuse and neglect . . . and whether or not any investigation already undertaken by [Iowa P&A] or likely to be undertaken by [Iowa P&A] has or will reveal that no abuse or neglect has occurred . . . [Iowa P&A] is still irreparably harmed by being prevented from pursuing fully its right to access records . . . in pursuit of its duty to investigate circumstances providing probable cause to believe abuse or neglect may be occurring.

*Iowa Protection and Advocacy*, at 1173 (citing to a similar holding in *Wisconsin Coalition for Advocacy, Inc. v. Czaplewski*, 131 F.Supp.2d 1039, 1051 (E.D. Wis. 2001)).  Furthermore, the Court in *Iowa Protection and Advocacy* also cites *Advocacy Center v. Stalder*, 128 F.Supp.2d 358 (M.D. La 1999) where the court reached the same holding with respect to a permanent injunction. Iowa P&A has argued that it replicating the findings from these undisclosed reports would be time consuming and costly.  Indeed, in the case of the Minutes, replication is impossible.

**2.     Balance of Harms**

The primary potential harm cited by both DHS and DIA in this case is confidentiality; however, "PAIMI imposes a duty of confidentiality on the advocacy organizations." *Iowa Protection and Advocacy*, at 1160 (citing *Oklahoma Disability Law Ctr., Inc. v. Dillon Family & Youth Servs., Inc.,* 879 F.Supp. 1110, 1112 (N.D. Okla 1995)).  See also 42 U.S.C. § 10806(a). Consequently, several district courts have concluded that the issue of confidentiality should not

act as a bar to disclosure to a protection and advocacy system. *See Iowa Protection and Advocacy*, at 1174-75; *Stalder* at 366 ("[U]nder the [PAIMI] Act a protection and advocacy system must maintain the confidentiality of the records to the same extent as the provider of the service. There is no reason to suspect that the confidentiality of the records will be breached."); *Pennsylania Protection and Advocacy, Inc. v. Houstoun*, 228 F.3d 423, 428-29 (3rd Cir. 2000); *Wisconsin Coalition for Advocacy, Inc.* at 1052. Furthermore, the Court in *Iowa Protection and Advocacy* astutely points out that "one would suppose that a facility's legitimate interests are *served* when abuse and neglect are uncovered and can be corrected." *Iowa Protection and Advocacy*, at 1175.

### 3. Public Interest

"[T]he public interest, as weighed by Congress, weighs in favor of injunctive relief permitting [Iowa P&A] to obtain access . . ." *Iowa Protection and Advocacy*, at 1175. This holds equally true in the case at bar. The PADD Act and the PAIMI Act set forth a clear federal legislative mandate for protection and advocacy systems to review independently care for dependent adults by state and privately run caregivers. The PADD Act requires states receiving certain allotments to "have in effect a system to protect and advocate the rights of individuals with developmental disabilities," where a system is defined as a "protection and advocacy system . . . to protect the legal and human rights of individuals with developmental disabilities." 42 U.S.C. § 15043(a)(1); 42 U.S.C. § 15041. The congressional findings in the PAIMI Act states that "[s]tate systems for monitoring compliance with respect to the rights of individuals with mental illness vary widely and are frequently inadequate." 42 U.S.C. § 10801(a)(4). Furthermore, Congress explicitly stated in the PAIMI Act that its purpose is to "(1) ensure that the rights of individuals

with mental illness are protected; and (2) to assist States to establish and operate a protection and advocacy system for individuals with mental illness which will . . . (B) investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred."  42 U.S.C. § 10801(b).

To the extent that Iowa law conflicts with Congress's establishment of public policy, or to the extent issues of attorney-client privilege or attorney work-product conflict, those questions go to the merits of the case.  Under the Supremacy Clause of the United States Constitution, this Court must give deference to the federal government's policy intentions with respect to enabling protection and advocacy systems to investigate allegations of abuse of adults in dependent care.

One other policy consideration raised by Mr. Allen was the ability of employees "to speak freely, without fear of discipline or repercussions" in mortality review meetings.  Mr. Allen has not offered any authority for carving out such a privilege.  While this Court understands the value of a protected exchange of views and ideas, it does not have the authority to countermand the express policy preferences of Congress.  It is Congress's clear intent for protection and advocacy systems to participate in the review of treatment of dependent adults and ultimately to ensure their rights.  It would certainly undermine Congressionally mandated independent review if dependent adult care workers can cloak discussions about potential abuse at will by simply declaring such discussions "off the record," even if the motives for doing so are genuinely constructive.  To shield from independent review valuable records of this type of appraisal would directly contradict the expressly stated public policy of Congress.

**B.     The Merits**

**1.     The DIA Report**

**a.     The Applicability of Federal Statutes and Regulations**

Mr. Techau and Mr. Tooman contend that Iowa Code § 235B.6 prohibits them from

releasing the DIA report.  Iowa Code § 235B.6(3) states:

> Access to unfounded dependent adult abuse information is authorized only to those
> persons identified in subsection 2, paragraph "*a*," paragraph "*b,*" subparagraphs (2)
> and (6), and paragraph "*e*," subparagraph (2).

Indeed, Iowa P&A is not covered in any of the aforementioned sections.  Mr. Techau and Mr.

Tooman argue that this prohibition does not conflict with the PADD and PAIMI Acts.  Before

examining the language of the federal statutes, it is worth noting that subsection 2, paragraph "*b*,"

mentioned above, which excludes Iowa P&A, enumerates who may be a "person involved in an

investigation of dependent adult abuse . . ."  Thus, while the defendants in this case have not

called into question Iowa P&A's right to investigate, it is clear from that section that Iowa Code §

235B.6 in a broad sense does not conform to federal law.

Mr. Techau and Mr. Tooman argue that because the DIA report concluded that abuse

allegations are "unfounded," it is not covered by the PADD and PAIMI Acts.  They point to 42

C.F.R. 51.41(c)(2)(i):

> (c) Information and individual records, whether written or in another medium . . .
> shall be available to the P&A system under the Act shall include *but not be limited
> to*:
>> . . . (2) Reports prepared by an agency charged with investigating
>> abuse, neglect, or injury occurring at a facility rendering care or
>> treatment, or by or for the facility itself, that describe any or all of
>> the following:
>>
>>> (i)    Abuse, neglect, or injury occurring at the facility;

42 C.F.R. 51.41(c)(2)(i)(emphasis added). Mr. Techau and Mr. Tooman argue that since by a preponderance of the evidence, there was no finding of abuse, the federal regulation and statute does not mandate the release of the report. To say this is a tortured reading of the statutory scheme is too generous.

First, Mr. Techau and Mr. Tooman ignore the language italicized above which explicitly states that the regulation in no way intends to limit what a protection and advocacy system is entitled to under the statute or other parts of the regulatory scheme. Second, Mr. Techau and Mr. Tooman read this regulation as limiting Iowa P&A's access to reports of abuse, even though the subparagraph lists "abuse, neglect, *and injury*." Hence, even if this Court were to accept the argument that the state can escape independent review by simply "finding" that abuse did not occur, in this case there is no question that there was an injury to Mr. Tielebien.

Third, Mr. Techau and Mr. Tooman overlook subparagraphs (ii), (iii) and (iv) in that section, which entitle Iowa P&A to reports that relate to:

> (ii) The steps taken to investigate the incidents;
>
> (iii) Reports and records, including personnel records, prepared or maintained by the facility, in connection with such reports of incidents; or
>
> (iv) Supporting information that was relied upon in creating a report, including all information and records used or reviewed in preparing reports of abuse, neglect or injury such as records which describe persons who were interviewed, physical and documentary evidence that was reviewed, and the related investigative findings.

It is important to note that neither subparagraphs (ii) nor (iii) are in any way limited by the existence of abuse, neglect or injury. Nor is there any reason to conclude that the term "incident" is invested with a formal qualitative finding on what took place. Neither the regulation nor the

statute defines "incident" more narrowly than its common usage.

Furthermore, the statute itself provides clear authority to Iowa P&A to have access to records of an investigation regardless of the agency's internal findings of abuse or neglect.[1]  42 U.S.C. § 15043(a)(2)(I)(ii) & (iii) both state that a state's protection and advocacy system shall "have access to all records of an individual with a developmental disability, in a situation which:"

> [A] complaint has been received by the system about the individual with regard to the status or treatment of the individual with regard to the status or treatment of the individual or, as a result of monitoring or other activities, there is probable cause to believe that such individual has been subject to abuse or neglect . . .[2]

---

[1] The PADD Act defines the term "records" broadly:

In this section, the term "record" includes-

> **(1)** a report prepared or received by any staff at any location at which services, supports, or other assistance is provided to individuals with developmental disabilites;

> **(2)** a report prepared by an agency or staff person charged with investigating reports of incidents of abuse or neglect, injury or death occurring at such location, that describes such incidents and the steps taken to investigate such incidents; and

> **(3)** a discharge planning record.

[2] In full, 42 U.S.C. § 15043(a)(2)(I) states that a protection and advocacy system shall:

**(I)** have access to all records of-

**(i)** any individual with a developmental disability who is a client of the system if such individual, or the legal guardian, conservator, or other legal representative of such individual, has authorized the system to have such access;

**(ii)** any individual with a developmental disability, in a situation in which-

> **(I)** the individual, by reason of such individual's mental or physical condition, is unable to authorize the system to have access;

> **(II)** the individual does not have a legal guardian, conservator, or other legal

-14-

There is no qualification about the findings with respect to the "complaint" mentioned above, just that one was filed. Moreover, even if a complaint is not filed, if the protection and advocacy system determines that there is "probable cause" of "abuse or neglect," it may access the individual's records. It is worth noting that the PADD Act, as well as the PAIMI Act, are explicit about a probable cause standard, and not the "preponderance of the evidence" standard by which Mr. Tooman and Mr. Techau claim to assert that abuse has not taken place. More importantly, the statute is clear that it is the protection and advocacy systems that shall make the relevant probable cause determination, as a result of its "monitoring and other activities," and *not* a state agency.

Furthermore, the next subsection, 42 U.S.C. § 15043(a)(2)(J) states that the protection and advocacy system shall "have access to the records of individuals described" in subparagraph

---

representative, or the legal guardian of the individual is the State; and

**(III)** a complaint has been received by the system about the individual with regard to the status or treatment of the individual with regard to the status or treatment of the individual or, as a result of monitoring or other activities, there is probable cause to believe that such individual has been subject to abuse or neglect; and

**(iii)** any individual with a developmental disability, in a situation in which-

**(I)** the individual has a legal guardian, conservator, or other legal representative;

**(II)** a complaint has been received by the system about the individual with regard to the status or treatment of the individual with regard to the status or treatment of the individual or, as a result of monitoring or other activities, there is probable cause to believe that such individual has been subject to abuse or neglect;

**(III)** such representative has been contacted by such system, upon receipt of the name and address of such representative;

**(IV)** such system has offered assistance to such representative to resolve the situation; and

**(V)** such representative has failed or refused to act on behalf of the individual . . .

(I) and "other records that are relevant to conducting an investigation." Thus, the statutory mandate for production of records is intentionally broad.

In 42 U.S.C. § 15043(a)(3) of the PADD Act, Congress broadens even further the scope of documents to which Iowa P&A is entitled with respect to other independent reviews of treatment that are conducted:

> **(3)** to the extent that information is available, the State shall provide to the system-
>
> > **(A)** a copy of each independent review, pursuant to section 1396a(a)(30)(C) of this title, of an Intermediate Care Facility (Mental Retardation) within the State, not later than 30 days after the availability of such a review; and
> >
> > **(B)** information about the adequacy of health care and other services, supports, and assistance that individuals with developmental disabilities who are served through home and community-based waivers (authorized under section 1396n(c) of this title) receive . . ."

Thus, even if this Court agreed that all the other parts of this statute with respect to an investigation were limited somehow by DIA's findings, the subparagraph above would probably cover them.

The PAIMI Act is no less clear, it states that a protection and advocacy system shall:

> **(4)** in accordance with section 10806 of this title, have access to all records of-
>
> > **(A)** any individual who is a client of the system if such individual, or the legal guardian, conservator, or other legal representative of such individual, has authorized the system to have such access;
> >
> > **(B)** any individual (including an individual who has died or whose whereabouts unknown)-
> >
> > > **(i)** who by reason of the mental or physical condition of such individual is unable to authorize the system to have such access.

**(ii)** who does not have a legal guardian, conservator, or other legal representative, or for whom the legal guardian is the State; and

**(iii)** with respect to whom a complaint has been received by the system or with respect to whom as a result of monitoring or other activities (either of which result from a complaint or other evidence) *there is probable cause to believe that such individual has been subject to abuse or neglect . . .*

42 U.S.C. § 10805(a)(4) (emphasis added).  Once again, Congress applies the complaint or probable cause standard to whether the protection and advocacy system may access records.

**b.      Federal Preemption**

By virtue of the Supremacy Clause of the United States Constitution, federal law — which "encompasses both federal statutes themselves and federal regulations that are properly adopted in accordance with statutory authorization," *City of New York v. Federal Communications Comm'n*, 486 U.S. 57, 63 (1988) — can preempt state law.  In some cases, federal law may expressly preempt state or local law, *see Kinley Corp. v. Iowa Utilities Bd.*, 999 F.2d 354 (8th Cir. 1993), or federal law may so "occupy the field" of a given area that state law is deemed preempted, *see Heart of Am. Grain Inspection Serv., Inc. v. Missouri Dep't of Agric.*, 123 F.3d 1098 (8th Cir. 1997).  Even if, as in this case, Congress has not occupied the field, "state law is naturally preempted to the extent of any conflict with a federal statute, . . . [or] where under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372-73 (2000) (citations and brackets omitted).

In the case of the PAIMI Act, the state law is expressly preempted.  It states:

If the laws of a State prohibit an eligible system from obtaining access to the records of individuals with mental illness in accordance with section 10805(a)(4)

of this title and this section shall not apply to such system before–

> **(i)** the date such system is no longer subject to the prohibition; or

> **(ii)** the expiration of the 2-year period beginning on May 23, 1986, whichever occurs first.

42 U.S.C. § 10806(b)(2)(C). Thus, after May 23, 1988, the section will apply regardless of the laws of the State. At least two other district courts have upheld this express preemption. *Stalder*, at 367; *Okla. Disability Law Ctr., Inc.*, at 1112.

In the case of both the PAIMI Act and the PADD Act, it is clear that Congress has, indeed, "occupied the field," with respect to the investigatory powers and rules of disclosure regarding protection and advocacy systems for dependent adults. The statutory and regulatory scheme would not make sense any other way. Protection and advocacy systems are established as independent checks on state care and regulation of care for dependent adults. That independent check would become meaningless if a state was allowed to simply legislate away a protection and advocacy system's power to investigate by enacting restrictions.

**2.      The Woodward Internal Investigation Report**

Ms. Rasmussen and Ms. Davis declined to produce the Hines Report at the insistence of Mr. Allen, who claims the report was prepared for him and is therefore covered by the attorney work product doctrine. Rule 26(b)(3) of the Federal Rules of Civil Procedure codifies the general judicial rule protecting attorney work product set forth in *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947); however, Rule 26 limits discovery in the civil litigation process, and therefore does not apply in this case. Hence, the authority for application of the work product doctrine in this case flows exclusively from the judicial doctrine of *Hickman* and not any statutory mandate. In

determining whether the Hines Report is protected by attorney work product doctrine, this Court first must decide whether it is covered, and then whether the federal statutory mandate of the PADD Act and the PAIMI Act overrides the qualified privilege that the work product doctrine creates.

**a.      The Applicability of the Work Product Doctrine**

"The work product doctrine was designed to prevent 'unwarranted inquiries into the files and mental impressions of an attorney,' and recognizes that it is 'essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel.'" *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 400 (8th Cir. 1987) (quoting *Hickman* at 510-11). "The rule establishes a qualified immunity for ordinary work product that which does not contain the mental impressions, conclusions or opinions of the attorney." *Id.* Under the general rule, "[s]uch work product is discoverable only upon a showing of substantial need and an inability to secure the substantial equivalent of the items through alternate means without undue hardship." *In re Murphy*, 560 F.2d 326, 334 (8th Cir.1977). Nevertheless "the parties asserting privilege as a bar to discovery, must carry the initial burden of proving a factual basis establishing the applicability of the privilege." *St. Paul Reins. Co., Ltd. et al. v. Commercial Fin. Corp.*, 197 F.R.D. 620, 631 (N.D. Iowa 2000).

In the Eighth Circuit, the test for whether documents are protected by the attorney work product doctrine is simply whether they were prepared "in anticipation of litigation." *Simon* at 400. Furthermore, the Eighth Circuit explicitly adopts the test set forth in *Wright & Miller* for determining whether a document was prepared in anticipation of litigation:

"[T]he test should be whether, in light of the nature of the document and the

-19-

factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation. But the converse of this is that even though litigation is already in prospect, there is no work product immunity for documents prepared in the regular course of business rather than for purposes of litigation."

*Id.* (quoting 8 C. Wright & A. Miller, Federal Practice and Procedure § 2024, at 198-99 (1970) (footnotes omitted)).

The question of whether the Hines Report was legitimately prepared in anticipation of litigation under this standard is a close one. Mr Allen contends that he, as a lawyer for DHS, commissioned the Hines Report upon receiving a letter from DOJ informing him that they would investigate Woodward and the Glenwood Resource Center, another facility. Indeed, there is very little case law that speaks to the issue of whether a document prepared in response to a government investigation is a document prepared in anticipation of litigation.

Iowa P&A cites *Guizzino v. Felterman*, 174 F.R.D. 59, 63 (W.D. La 1997) as persuasive authority that a document prepared "in anticipation of a federal agency's investigation" is not covered by the work product doctrine. What Iowa P&A does not reveal is that *Guizzino* also states that "[f]ederal courts have concluded that once an investigation by a federal agency has commenced . . . a [party] may reasonably said to anticipate litigation." *Id.* (citing *Koenig v. International Systems & Controls Corp.*, 693 F.2d 1235 (5th Cir. 1982)).

Nevertheless, the rule stated in *Guizzino* is not necessarily as broad as the court makes it appear. The court in *Koenig* refers to a specific circumstance where the Securities and Exchange Commission initiated an investigation regarding "sensitive payments" or in layman's terms, overseas payoffs, a circumstance where apparently shareholder litigation reliably ensues. *Koenig*, at 1239, n.4. See also *In re Grand Jury Investigation*, 599 F.2d 1224, 1229 (3rd Cir. 1979)

(holding that documents were covered by work product because "investigation concerned suspected criminal violations," evidence supporting illicit activity was already uncovered, and "potential for litigation was immeasurably intensified by [the company's] legal obligations to report any wrongdoing to its stockholders and to various governmental agencies.")

Furthermore, in cases where the investigating agency itself is the party asserting work-product doctrine, courts have held that a government investigation alone does not imply anticipation of litigation. In *Peterson v. United States*, 52 F.R.D. 317, 321 (S.D. Ill. 1971), the court rejected the assertion of the government that Internal Revenue Service investigatory and settlement memoranda were trial preparation materials, stating that "[p]resumably [the documents] are prepared in the assessment and review process and, if they be held to be in anticipation of litigation, it is hard to see what would not be. Litigation cannot be anticipated in every such case when relatively few result in litigation." See also *Abel v. Investment Co. v. United States*, 53 F.R.D. 485 (D. Neb. 1971); *SEC v. Nat'l Student Mktg. Corp.*, 1974 WL 415, *9 (D.D.C. ) (extending holdings of *Peterson* and *Abel* to discoverability of internal Securities and Exchange Commission investigatory documents). But see *Crocker in United States*, 51 F.R.D. 155 (N. D. Miss. 1970); *Weir Foundation v. United States,* 1972 WL 411, *2 (S.D.N.Y.).

In *Culinary Foods, Inc. v. Raychem Corp.*, 150 F.R.D. 122, 130 (N.D.Ill. 1993), the court used a similar analysis in declining to shield documents belonging to the Occupational Safety and Health Administration ("OSHA") that arose out of an investigation.

> Because one of the general purposes of OSHA is to investigate work related deaths and injuries, no clear cut rule can be established for determining whether these investigations fall under the work product doctrine. That an investigation was conducted does not alone cloak the documents prepared by an attorney as work product.

*Id.* (citing *McLaughlin v. Miles Laboratories, Inc.,* 124 F.R.D. 629, 630 (N.D.Ind. 1988). Thus, it appears that regardless of whether the party asserting work product doctrine was investigated or an investigating agency, determining whether a party can claim that an investigation reasonably implied pending litigation depends upon the nature of the agency investigation and how regularly such investigations result in litigation.

In this case, the Court does not find sufficient evidence that the DOJ investigation pursuant to 42 U.S.C. § 1997 created a reasonable expectation of litigation. Aside from Mr. Allen's assertions in his briefs and at arguments and his stated belief that the investigation was "widely reported," the only other information on the DOJ investigation is a letter from the DOJ produced by Mr. Allen after the hearing at the Court's request. According to Mr. Allen, "[t]he result of that investigation, if they find egregious, flagrant and a pattern of practice of constitutional violations . . . the ultimate result of that is litigation commenced by the U.S. Attorney General against the state of Iowa." While such a finding could naturally result in litigation, the letter itself is clear that such a finding is not a foregone conclusion, nor is litigation the only corrective action that might result. "The inititation of this investigation does not indicate a prejudgment on our part that residents' federal rights, in fact, have been violated. However, if any violations are found, we look forward to conferring with you and your staff concerning appropriate corrective action." When asked if, in addition to the letter of investigation, there was any other evidence that such litigation would inevitably ensue, Mr. Allen responded "[o]ther than my discussions with them, the exit interviews that I have had at the facilities, my anticipation and my reading of cases in other jurisdictions . . . in answer to your question, the short answer is no."

"It is not the court's burden to establish the applicability of the privilege to the documents by engaging in a factual and legal analysis on the discovery opponent's behalf." *Culinary Foods, Inc.* at 130 (citing *Holzman v. Jaymar- Ruby, Inc.*, 916 F.2d 1298, 1303 (7th Cir. 1990)). In order to block the production of the Hines Report, Ms. Rasmussen and Mr. Davis had the burden to

establish that a DOJ investigation pursuant to 42 U.S.C. § 1997 strongly implies future litigation. All that was offered was verbal assertions by counsel. If the Court found that sufficient, it would render the burden to establish the privilege meaningless.

Hence, the Court finds that Ms. Rasmussen and Mr. Davis did not meet their burden to show that the "Hines" Report is protected by the attorney work product doctrine.

**b.      Overcoming the Qualified Work Product Privilege**

Even if Ms. Rasmussen and Mr. Davis had sufficiently showed that the Hines Report was prepared in anticipation of litigation, established that it was covered by the work product doctrine, and protected by a qualified privilege, Iowa P&A could overcome the qualified privilege with a good faith showing of good cause.

In the context of civil litigation, when a document is covered by the qualified privilege created by work product doctrine, the party seeking the document can overcome that privilege by showing a substantial need for the document and an inability to reasonably obtain the information within those documents through other means. *Murphy* at 334. On the other hand, in a case such as this, where the production of the documents in question is mandated by statute, the standard for overcoming the qualified work product privilege is far less stringent.

At least one other federal district court has addressed the qualified work product privilege with respect to a request backed by a federal statute outside the context of civil litigation. In *United States v. Brown*, 349 F.Supp 420 (N.D.Ill. 1972), the Internal Revenue Service sought documents prepared by an individual's accountant pursuant to investigative authority established by federal statute. The court addressed the extent to which this authority eroded the qualified work product privilege protecting the documents, stating that "the work product doctrine as promulgated in *Hickman* [should] be tailored to reflect the important policies with which Congress was concerned in passing [the legislation]." *Id* at 430.

The court in *Brown* cited several factors for why it is necessary to modify the work

product doctrine. "First, there is the general policy that access to information is productive of justice in administrative proceedings and investigations as it is in both civil and criminal litigation." *Id.* Second, the importance of the particular investigation "to the integrity and equity of the system. . ." In *Brown*, the investigation was by the IRS and the system was that of taxation, in this case, the investigation is by Iowa P&A and the system is that of care for dependent adults. Third, the court stated that the "intent of Congress in [the] particular legislation [was] unequivocal."

> Unlike the case in *Hickman*, there is here a clear statute which reflects the strong congressional desire to further . . . inquiries. While the statute cannot be fairly said to overrule the qualified privilege based on the work product doctrine by its silence, courts should scrutinize and give the most careful consideration to any application of the work product doctrine which would have the effect of impairing the effectiveness of such clearly mandated administrative investigations.

*Id.* at 430-1. Consequently, the court endeavored to create a lower standard for obtaining documents covered by the qualified work product privilege than the substantial need standard used in civil litigation.

The court held that a party by statutory mandate seeking documents covered by the work product doctrine must simply "show 'good cause' by making a good faith declaration that the documents are believed necessary . . . and that it is believed that the information contained therein cannot be obtained from any other source." *Id.* at 431. Upon this showing, the other party "should then have the opportunity to show the court that the contents of the particular documents at issue are not related . . . or necessary . . ." *Id.* The court in *Brown* concluded that "the effect of this modification of the work product doctrine . . . will be to protect legitimate work product materials consistent with the purpose of the doctrine in the *Hickman* context of civil litigation, while avoiding unnecessary conflict with . . . statutory language . . ." *Id.*

The standard enunciated in *Brown* is apt in this case. The interest in disclosure in this case is not the private interest of a litigant but a public interest codified in federal statute. The integrity of the system of care for dependent adults demands that relevant information come to light and

that courts not afford wide ranging protection of potentially incriminating information. Finally, Congress enumerated a wide ranging statutory and regulatory scheme for the disclosure of information in the field of dependent adult care. Congress certainly did not intend for a government investigation to create an umbrella of qualified work product privilege that prevents protection and advocacy systems from fulfilling their statutory duty of independent review.

In light of this analysis, this Court holds that Iowa P&A is entitled to the Hines Report on Woodward regardless of whether it is, in fact, covered by the work product doctrine.

**3.      The Minutes**

Mr. Allen's argument for protecting the Minutes did not rest on any established legal doctrine, but the policy arguments discussed above. Since, as discussed above, those policy arguments fail, the Court finds that Ms. Rasmussen and Ms. Davis must produce them.

**IV.      Order**

In light of the findings above, the Court hereby permanently enjoins the Iowa Department of Investigations and Appeals and the Department of Human Services from withholding the section of the Randall Hines Report pertaining to the Woodward facility, the Department of Inspections and Appeals findings on the allegations of abuse of Larry Tielebein, and the minutes of the mortality review committee meeting on the death of Larry Tielebein.

IT IS SO ORDERED.

Dated this ___12th___ day of March, 2002.


_____
ROBERT W. PRATT
U.S. DISTRICT JUDGE